Rudy A. PULIDO; Walter H. Baird; Glenn G. Moore; Jim S. Noel; Loren L. Reynolds; John M. Swomley, Jr.; G. Hugh Wamble; James A. White; Roy E. Willey; Geneva Dalton; Lakisa Dalton, a minor; Mashawn Dalton, a minor; Nicole Dalton, a minor; Siobhan Dalton, a minor; Anthony Fuqua, a minor; Trana Fuqua, a minor; Rickey Fuqua, a minor, said minors appearing by Geneva Dalton, as next friend; and Benny Gooden, Appellees,

v.

William J. BENNETT, individually and as Secretary of the United States Department of Education; and United States Department of Education, Appellants,

Ronald Jones, et al., Intervenor,

and

Blue Hills Homes Corporation, a Missouri non-profit corporation.

Rudy A. PULIDO; Walter H. Baird; Glenn G. Moore; Jim S. Noel; Loren L. Reynolds; John M. Swomley, Jr.; G. Hugh Wamble; James A. White; Roy E. Willey; Geneva Dalton; Lakisa Dalton, a minor, Mashawn Dalton, a minor; Nicole Dalton, a minor; Siobhan Dalton, a minor; Anthony Fuqua, a minor; Trana Fuqua, a minor; Rickey Fuqua, a minor, said minors appearing by Geneva Dalton, as next friend; and Dr. Benny Gooden, as next friend for his minor son, Appellants,

v.

William J. BENNETT, individually and as Secretary of the United States Department of Education; and United States Department of Education; Blue Hills Homes Corporation; Ronald Jones; Theresa Jones; Grace Moorning; William Grahl; Julia Ann Grahl; Dwayne Johnson; Daniel Hof and Linda Hof; Pamela Joan Brobst; Linda Johnson, Appellees.

Nos. 86-1795, 87-1228.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 9, 1987.

Decided June 2, 1988.

Lee Boothyby, Berrien Springs, Mich., for appellants.

Howard S. Scher and Patricia A. Dean, Washington, D.C., for appellees.

Before JOHN R. GIBSON and FAGG, Circuit Judges, and HENLEY, Senior Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

The use of mobile classrooms to provide remedial services to educationally deprived children enrolled in private schools, and the formula for allocating the cost between public and private schools for such services, which the Secretary of Education authorized under Chapter I of the Education Consolidation and Improvement Act of

1981,[1] give rise to the controversy before us. The primary issue presented is whether federal taxpayers have standing to challenge these guidelines on establishment clause grounds. We also consider whether state and local taxpayers and representatives of children currently or formerly enrolled in Missouri public schools have standing to bring such a challenge; the district court's jurisdiction over related claims brought by the Superintendent of the Boonville, Missouri School District; and whether the Secretary of Education, William J. Bennett, is entitled to qualified immunity from suit. In a series of orders, the district court dismissed all claims for declaratory and injunctive relief, ruling that the plaintiffs lacked standing in each capacity in which they attempted to sue,[2] and that the court lacked jurisdiction over the Superintendent's claims. The court also ruled that Secretary Bennett was not entitled to qualified immunity. We affirm the district court's orders regarding standing and jurisdiction, but reverse its judgment on the question of qualified immunity.

The history of the federal government's efforts to provide remedial educational services to students in Missouri's private schools is documented in *Wamble v. Bell,* 598 F.Supp. 1356, 1359–65 (W.D.Mo.1984), *appeals dismissed,* 473 U.S. 922, 105 S.Ct. 3549, 87 L.Ed.2d 672 (1985). Since 1976, the Department of Education has bypassed Missouri's state and local educational agencies and provided these services through an independent contractor, Blue Hills Homes Corporation (BHHC). *See id.* at 1360–62. For some time BHHC followed Department of Education guidelines in using federal funds to provide remedial instruction in the sectarian schools. *See id.* at 1362–63. This practice was enjoined in *Wamble* as a violation of the religious neutrality and church/state entanglement principles of the establishment clause. *Id.* at 1371–74. *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), later confirmed that using federal funds to send public school teachers into religious schools to provide instruction and other educational services violates the establishment clause.

In August, 1985 and June, 1986, the Department of Education issued new guidelines for implementing Chapter I after *Aguilar.* These guidelines authorize the use of mobile vans or other portable classroom units to provide Chapter I services on public property near the private schools or, in certain circumstances, on playgrounds, parking lots, or other property belonging to the schools. The guidelines also authorize public agencies to enter into lease agreements with the schools to use such property. Finally, the guidelines state that any "reasonable and necessary costs" incurred in providing "off-premises" services to private school children are "allowable Chapter I costs" which should be deducted from a state or local educational agency's entire Chapter I allocation (as distinguished from that part of the allocation targeted to private school students alone). Such costs may include the rental of facilities, the costs of transporting students, and the costs of administration.

In 1986, an amended complaint was filed listing eight separate causes of action. These have been reduced on appeal to three basic claims, all of which involve the new Chapter I guidelines. Pulido, Gooden and Dalton first contend that the establishment clause prohibits the Department of Education from deducting bypass expenses "off the top" of the entire state or local allocations. They also argue that the establishment clause prohibits parking mobile vans or classrooms on parochial school

---

1. 20 U.S.C. §§ 3801–3808 (1982 & Supp. III 1985). Chapter I authorizes the Secretary to provide financial assistance to state and local educational agencies or to make other arrangements for the delivery of remedial services to eligible private school children.

2. Nine of the eleven plaintiffs claim standing as taxpayers only: Pulido, Baird, Moore, Noel, Reynolds, Swomley, Wamble, White and Willey.

For convenience, we will refer to these plaintiffs collectively as "Pulido." Three of these—Pulido, Swomley and Wamble—are also Protestant ministers. Their claim of standing as ministers was rejected by the district court and is not raised on appeal. The two remaining plaintiffs—Geneva Dalton and Benny Gooden—are referred to individually.

property and prohibits the government from leasing or purchasing property for the exclusive use of parochial school students. In each instance, they claim that the provisions of Chapter I are void to the extent that they either require or permit such action. The complaint alleges that BHHC has followed these guidelines in Missouri by providing Chapter I services in mobile vans sent to parochial schools, and that the department has withheld funds from local Chapter I allocations to pay BHHC for these services.

Pulido, Gooden and Dalton claim standing as federal, state and local taxpayers to challenge the manner in which tax revenues are being allocated to implement Chapter I in Missouri. In addition, Gooden claims standing in his official capacity as Superintendent of the Boonville School District, and in his individual capacity as the father of a boy eligible for Chapter I services and enrolled in the Boonville Public School during the 1985–86 school year. The complaint further alleges that Geneva Dalton is the grandmother and legal guardian of seven eligible children enrolled in the Kansas City Missouri School District, and that Dalton is entitled to represent the children in this proceeding as next friend. Pulido, Gooden and Dalton seek declaratory and injunctive relief from the actions of Secretary Bennett, the Department of Education and BHHC, as well as damages from Bennett in his individual capacity.

Before trial, the district court ruled that Pulido, Gooden and Dalton lacked taxpayer standing to challenge the department's implementation of Chapter I, and that it lacked jurisdiction over Gooden's official-capacity suit. The court also ruled that Secretary Bennett was not entitled to qualified immunity on the plaintiffs' claim that Bennett had failed to implement *Aguilar*, but all other claims for damages against Bennett were dismissed. This court then granted the Secretary's motion for a stay of trial proceedings as to the former claim.

On June 30 and July 1 and 2, 1986, the court held a trial on the remaining claims for injunctive and declaratory relief brought by Gooden on behalf of his son and by Geneva Dalton on behalf of the seven children in her care. Before judgment was issued, Secretary Bennett, the ·Department of Education and BHHC filed a joint post-trial motion to dismiss. The district court then determined that Gooden's claims had become moot when he and his son moved to Arkansas before the 1986–87 school year, and that Geneva Dalton had failed to establish the standing of any of the children she represented. The court dismissed Gooden and Dalton's complaint, and this appeal followed.

On appeal, Pulido, Gooden and Dalton argue that they have taxpayer standing to challenge the operation of Chapter I in Missouri; that Gooden's successor as Superintendent of the Boonville School District has standing to maintain this suit; that Gooden's claims in his individual capacity did not become moot when he moved to Arkansas; and that two of the children represented by Dalton have standing to assert the claims in the complaint.[3] On cross-appeal, Secretary Bennett argues that he is entitled to qualified immunity.

I.

A.

Pulido, Gooden and Dalton first contend that the district court erred in ruling that they lacked standing as federal taxpayers to challenge the Department of Education's implementation of Chapter I. The district court, relying principally on *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), and *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), ruled that the taxpayers lacked standing because their complaint challenged executive or administrative action, rather than congres-

---

3. Pulido, Gooden and Dalton also ask us to reach the merits on two of their establishment clause claims. As the district court did not pass on these claims, and in view of our disposition of the standing and qualified immunity issues, it is unnecessary that we do so. *See Singleton v. Wulff*, 428 U.S. 106, 119–21, 96 S.Ct. 2868, 2876–78, 49 L.Ed.2d 826 (1976).

sional action under the taxing and spending clause, Art. I, § 8, of the Constitution.

We initially affirm the district court's ruling that the amended complaint challenges executive or administrative action rather than the statute itself. First, the complaint challenges the equal expenditure provisions of Chapter I, 20 U.S.C. § 3806(a), (b)(3)(A), to the extent that these provisions "authorize or permit" the "off-the-top" method of cost-allocation,[4] and challenges Chapter I as a whole insofar as it requires this allocation formula. When standing is challenged on the basis of the pleadings, we customarily "accept as true all material allegations of the complaint, and * * * construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). In this case, however, the taxpayers have purposefully declined to take the position that Chapter I requires this method of cost-allocation, focusing their challenge instead on the department's interpretive guidelines. The district court therefore did not err in construing this claim as challenging executive action alone. Similarly, the complaint challenges the department's guidelines insofar as they interpret Chapter I to permit parking mobile vans or classrooms on parochial school property. The taxpayers have consistently maintained that Chapter I does not require this interpretation. Finally, the complaint broadly challenges "[t]he provisions of Chapter I" to the extent that they "require or permit" the government or BHHC to lease or purchase property for the exclusive use of private school children. However, the taxpayers cite no statutory provision which might be read to require such action, nor have we located any. We conclude that the district court did not err in viewing the complaint as challenging the "guidelines, practices, and policies" of the Department of Education, rather than the statute itself.

Pulido, Gooden and Dalton do not seriously contest this ruling on appeal. Instead, they argue that taxpayer standing may be established solely by allegations that executive implementation of a congressional spending program violates the establishment clause.[5] They contend that the district court's distinction between congressional and executive action is unfounded, and that the cases cited by the court[6] are better read as distinguishing between congressional enactments under the taxing and spending clause and enactments under other constitutional provisions. As Chapter I was passed pursuant to the taxing and spending clause, they argue that the allegations in their complaint are sufficient to establish federal taxpayer standing.

We have carefully considered the authorities cited by the taxpayers, and we conclude that the district court did not err in its ruling. In *Flast v. Cohen*, the Supreme court held that in order to have standing, a federal taxpayer must "establish a logical

---

**4.** Section 3806(a) generally requires expenditures for private school students to "be equal (taking into account the number of children to be served and the special educational needs of such children) to expenditures for children enrolled in the public schools of the local educational agency." When a bypass is involved, section 3806(b)(3)(A) directs the Secretary to "pay to the provider the costs of such services, including the administrative costs of such services, from the appropriate allocation or allocations under this subchapter."

**5.** The taxpayers rely on *Aguilar*, 473 U.S. at 407, 408 n. 7, 105 S.Ct. at 3235, 3236 n. 7, *aff'g Felton v. Secretary, United States Dep't of Educ.*, 739 F.2d 48, 50, 52 (2d Cir.1984); *Grand Rapids School Dist. v. Ball*, 473 U.S. 373, 380 n. 5, 105 S.Ct. 3216, 3221 n. 5, 87 L.Ed.2d 267 (1985), *aff'g Americans United for Separation of Church and State v. School Dist. of Grand Rapids*, 718 F.2d

1389, 1390–91 (6th Cir.1983); *Wheeler v. Barrera*, 417 U.S. 402, 426–27, 94 S.Ct. 2274, 2287–88, 41 L.Ed.2d 159 (1974); *Flast*, 392 U.S. at 87, 88 S.Ct. at 1946, *on remand, Nat'l Coalition for Public Educ. v. Harris*, 489 F.Supp. 1248, 1251 (S.D.N.Y.), *appeal dismissed*, 449 U.S. 808, 101 S.Ct. 55, 66 L.Ed. 11, *reh'g denied*, 449 U.S. 1028, 101 S.Ct. 601, 66 L.Ed.2d 491 (1980); *Doremus v. Board of Education*, 342 U.S. 429, 434, 72 S.Ct. 394, 397, 96 L.Ed. 475 (1952); and *Wamble v. Bell*, 538 F.Supp. 868, 871–72 (W.D.Mo.1982).

**6.** *Valley Forge*, 454 U.S. at 479 & n. 15, 102 S.Ct. at 762 & n. 15; *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 228, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974); *Americans United for Separation of Church and State v. Reagan*, 786 F.2d 194, 200 (3d Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 314, 93 L.Ed.2d 288 (1986).

link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality *only* of exercises of congressional power under the taxing and spending clause * * *." 392 U.S. at 102, 88 S.Ct. at 1953 (emphasis added), *quoted in Valley Forge,* 454 U.S. at 478, 102 S.Ct. at 761.[7] In ruling that the appellants had met this test, the *Flast* Court was careful to state that "[a]ppellants' constitutional attack focused on the *statutory criteria* which state and local authorities must meet to be eligible for federal grants under [Title I]," and that the appellants specifically challenged the requirement set forth in 20 U.S.C. § 241e(a)(2) (Supp. II 1964). 392 U.S. at 86, 88 S.Ct. at 1945 (emphasis added).

The precise contours of the *Flast* holding were reaffirmed in *Valley Forge.* There the Supreme Court ruled that the appellants' claim failed the *Flast* test in two respects: first, because the source of their complaint was not congressional action, but executive branch action "arguably authorized" by statute, *Valley Forge,* 454 U.S. at 479 & n. 15, 102 S.Ct. at 762 & n. 15, and second, because the authorizing legislation was not enacted under the taxing and spending clause. *Id.* at 480, 102 S.Ct. at 762. In our view, each of these grounds was sufficient in itself to dispose of the case. Pulido, Gooden and Dalton point out that the decisions cited by the district court involve failures on both grounds. *See supra* note 6. In each instance, however, the court emphasized that the focus of the complaint was executive rather than congressional action, and that this defeated any claim of taxpayer standing. *See, e.g., Schlesinger,* 418 U.S. at 228, 94 S.Ct. at 2395; *Valley Forge,* 454 U.S. at 510–11, 102 S.Ct. at 778–79 (Brennan, J., dissenting on this very point). We accord-

ingly affirm the district court's ruling that under *Flast* and *Valley Forge,* federal taxpayers do not have standing to challenge executive action which is "arguably authorized" by a congressional act, whether that act is passed pursuant to the taxing and spending clause or some other constitutional provision.

We also reject the taxpayers' arguments that the Supreme Court's subsequent decision in *Aguilar v. Felton, supra,* and the district court's ruling on standing in *Wamble v. Bell,* 538 F.Supp. at 871–72, require a contrary result. In *Aguilar,* the question of taxpayer standing was neither presented to the Court nor raised by it, and the decision therefore cannot be read as modifying *Flast* and *Valley Forge sub silentio. See Allen v. Wright,* 468 U.S. 737, 764, 104 S.Ct. 3315, 3331, 82 L.Ed.2d 556 (discussing effect of summary affirmance), *reh'g denied,* 468 U.S. 1250, 105 S.Ct. 51, 82 L.Ed.2d 942 (1984); *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 119, 104 S.Ct. 900, 918, 79 ·L.Ed.2d 67 (1984). In *Wamble,* the defendants conceded the plaintiff's taxpayer standing to challenge the terms of Title I, 538 F.2d at 871, and sought dismissal only of that portion of the suit challenging "regulatory actions" under the act, *id.* at 872. The court ruled, in effect, that once jurisdiction had been conceded for the former claims it extended to the latter, as well. *See id.* The decision cannot be read, however, to establish taxpayer standing here.[8]

We affirm the district court's ruling that Pulido, Gooden and Dalton lack standing as federal taxpayers to challenge the Department of Education's implementation of Chapter I.

### B.

We also reject Pulido, Gooden and Dalton's contention that they are entitled to

---

**7.** *Flast* also requires the taxpayer to "establish a nexus between that status and the precise nature of the constitutional infringement alleged." 392 U.S. at 102, 88 S.Ct. at 1953. This portion of the *Flast* test is not at issue here.

**8.** The other cases relied upon to establish federal taxpayer standing, *see supra* note 5, are also distinguishable. *Grand Rapids,* 473 U.S. at 380

& n. 5, 105 S.Ct. at 3221 & n. 5, and *Doremus,* 342 U.S. at 433–34, 72 S.Ct. at 396–97, involved claims of state and local taxpayer standing, which are not subject to precisely the same requirements as federal taxpayer standing. *See infra* Part IB. The remaining cases did not squarely address or fully consider standing and, like *Aguilar,* are not controlling precedents.

standing as state and local taxpayers. Gooden claims that the Boonville School District has used local funds to maintain the public school program due to the high percentage of the federal grant withheld for operation of the bypass, and that his interest in the application of local tax revenues confers standing. No claim is made that state tax revenues are being used in a similar manner.

■ The record demonstrates that the district court did not err in dismissing this claim as well. Because Missouri's educational agencies have been bypassed, no state or local tax funds are used to provide Chapter I services to students in Missouri's sectarian schools. Pulido, Gooden and Dalton therefore cannot demonstrate that this is a "good-faith pocketbook action" to redress "a direct dollars-and-cents injury" they have suffered as state or local taxpayers. *Doremus*, 342 U.S. at 434, 72 S.Ct. at 397. *Cf. Grand Rapids*, 473 U.S. at 380 n. 5, 105 S.Ct. at 3221 n. 5 (state taxpayers have standing to challenge state programs for aiding nonpublic schools). Moreover, no claim is made that Chapter I requires state or local governments to supplement the federal grants. Because Gooden's injury results from the independent action of the Boonville School District, which is not a defendant here, he lacks standing to sue in federal court. *See Allen*, 468 U.S. at 757–59, 104 S.Ct. at 3327–29; *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–26, 48 L.Ed. 2d 450 (1976).

II.

A.

Relying on the automatic-substitution rule of Fed.R.Civ.P. 25(d)(1), Dr. Benny Gooden argues that his successor as Superintendent of the Boonville School District has standing to maintain this suit. The district court characterized Gooden's claim as a challenge to Secretary Bennett's decision to continue the bypass of Missouri's educational agencies after *Aguilar. See* 20 U.S.C. § 3806(b)(3)(C). The district court determined that if such decisions are

reviewable, the circuit courts have exclusive jurisdiction to review challenges to them brought by a state or local educational agency. *See* 20 U.S.C. § 3806(b)(4)(B). Because Gooden brought suit on behalf of the Boonville School District, he was precluded from seeking review in the district court. *See Karcher v. May*, —— U.S. ——, 108 S.Ct. 388, 393, 98 L.Ed.2d 327 (1987) (real party in interest in official-capacity suit is entity represented and not individual officeholder).

Gooden has not renewed his challenge to the Secretary's "bypass continuation decision" on appeal. Instead, Gooden argues that his action includes challenges to the "off-the-top" method of cost-allocation and to the purchase or lease of property for the exclusive use of parochial school students. He argues that these additional claims are completely divorced from the bypass decision, and that review in the district court is therefore not precluded by section 3806(b)(4)(B). Citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), Gooden argues that the claims may be reviewed in district court under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1982). Gooden also contends that his successor has standing under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 (1982).

We do not believe Gooden's additional claims are exempt from section 3806(b)(4). That section provides a specific procedure for state and local educational agencies to obtain review of "any final action" proposed or taken by the Secretary under the bypass provision, 20 U.S.C. § 3806(b), first by administrative hearing and then by appeal to the appropriate circuit court. The language of section 3806(b)(4) is therefore sufficiently broad to encompass Gooden's challenge to the arrangements made by the Secretary to provide and pay for services for private school students under 20 U.S.C. § 3806(b)(3)(A).

■ It is well established that when a statute specifically provides for exclusive jurisdiction in one court, the specific grant of jurisdiction takes precedence over a general grant of jurisdiction. *Southwestern*

*Bell Telephone v. Ark. Pub. Serv.,* 738 F.2d 901, 906 (8th Cir.1984), *vacated and remanded on other grounds,* 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 1973 (1986). This disposes of Gooden's claim that his successor may seek review in district court under the general provisions of the Administrative Procedure Act. *Id. See also Simmons v. Arkansas Power & Light Co.,* 655 F.2d 131, 133–34 (8th Cir. 1981). *Abbott Laboratories* is not to the contrary, as that case involved a question of statutory preclusion of judicial review, rather than a grant of exclusive jurisdiction. *See* 387 U.S. at 140–43, 87 S.Ct. at 1510–13. Finally, the Declaratory Judgment Act does not expand the jurisdiction of the district courts, but merely authorizes them to "declare the legal rights" of parties in cases over which they would otherwise have jurisdiction. 28 U.S.C. § 2201(a). *See generally Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671–72, 70 S.Ct. 876, 878–79, 94 L.Ed. 1194 (1950). We conclude that the claims asserted by Gooden in his official capacity fall within this court's exclusive jurisdiction under 20 U.S.C. § 3806(b)(4). As no steps were taken by the Boonville School District to secure review in this court, *see id.,* we affirm the order of the district court dismissing Gooden's official-capacity suit.

#### B.

■ Gooden also contends that the district court erred in dismissing the claims he brought in his individual capacity on behalf of his son. The district court found that Gooden resigned as Superintendent of the Boonville School District before the beginning of the 1986–87 school year to accept a similar position in Fort Smith, Arkansas, and that his son would therefore withdraw from the Boonville public schools. Because Gooden's son could no longer be affected by the Chapter I bypass provision or a judicial decision on the merits, the court ruled that Gooden's claims on behalf of his son had become moot and that Gooden therefore lacked standing. *See Board of License Commissioners v. Pastore,* 469 U.S. 238, 105 S.Ct. 685, 83 L.Ed.2d 618 (1985) (per curiam).

Gooden concedes that his son is no longer affected by the bypass provision. He argues, however, that the district court erred in finding that no decision on the merits could affect his son. He claims that the "off-the-top" method of cost allocation applies in all states, so that a decree barring its use would have nationwide effect. Gooden also argues that his request for monetary damages from Secretary Bennett preserves his claims.

The record before the district court contained no allegations or evidence that Gooden and his son reside in an Arkansas Chapter I area, that Gooden's son is eligible for Chapter I services there, or that the Secretary's "off-the-top" allocation formula is used in the school district. On appeal Gooden has attempted to cure these defects by submitting an affidavit regarding these matters, and discussion in the brief of circumstances under which a decision on the merits might affect his son. However, this court considers only the record before the district court, *e.g., Rebuck v. Vogel,* 713 F.2d 484, 486 (8th Cir.1983) (per curiam), and the " 'speculative contingencies' " Gooden identifies in his brief " 'afford no basis for our passing on the substantive issues [he] would have us decide,' " *Pastore,* 469 U.S. at 240, 105 S.Ct. at 686 (quoting *Hall v. Beals,* 396 U.S. 45, 49, 90 S.Ct. 200, 202, 24 L.Ed.2d 214 (1969)). We cannot conclude that the district court erred in finding, on this record, that no decision on the merits could affect Gooden's son. *See id.* 469 U.S. at 239–40, 105 S.Ct. at 685–86.

We also reject Gooden's argument that his request for damages preserves his claims. As we explain in Part IV below, Gooden's damages claim against Secretary Bennett is barred by the doctrine of qualified immunity. Moreover, a claim for damages cannot preserve claims for injunctive or declaratory relief which have otherwise become moot. *See, e.g., Martin v. Sargent,* 780 F.2d 1334, 1337 (8th Cir.1985). We affirm the district court's judgment that the claims Gooden brought in his individual capacity have become moot.

### III.

■ Geneva Dalton argues that the district court erred in ruling that she had failed to establish her standing. Because Dalton sued as next friend of the children in her care, her standing depended on that of the children. To be eligible for Chapter I services, a child must be both educationally deprived and reside in an eligible attendance area. *See* 20 U.S.C. § 3805(b)(1)(A), (B). The district court found that only two of the seven children Dalton represented were academically eligible for Chapter I services, and this finding is not challenged on appeal. The court further found that Dalton had failed to show that the two academically eligible children, Nicole Dalton and Rickey Fuqua, resided in the Kansas City School District's Chapter I area. On appeal, Dalton contends that this finding is clearly erroneous.

At trial the district court had before it the school records of the two children. Nicole Dalton's record indicates that her address is 5514 Wayne, and that she attended Hartman Elementary School during the 1985–86 school year. Rickey Fuqua's record indicates that his home address is 4547 Agnes, but that he "stays" at 5514 Wayne, and that he attended Troost Elementary School during the 1985–86 school year. The accuracy of these records was confirmed at trial, but no evidence was offered to show that these addresses are within Kansas City's Chapter I attendance area.

After trial, the district court received the sworn statement of Isaac Gardner, Supervisor of the Department of Exceptional Education and Pupil Services for the Kansas City School District, which provided: "This is to verify that the address 5547 WAYNE is, in fact, in the Chapter I area. Residents of this address should attend Troost Elementary School." Attached to the statement was a map of the attendance area for the Troost school, dated July, 1981, indicating that the 5500 block of Wayne, on both sides of the street, falls within the Troost attendance area. Also attached was a boundary description for the school, dated May 1, 1981, which corresponds to the boundary on the map.

The district court found that Gardner's statement did not establish the geographic eligibility of the children. No evidence was offered that the map and boundary description, which were apparently prepared in mid–1981, are currently valid. While Gardner's statement includes reference to an attachment, it does not specifically mention or otherwise verify the accuracy of these documents. No evidence was offered to explain the significance of Rickey Fuqua's "home" address, which is outside the Troost attendance area indicated on the map and boundary description, or Nicole Dalton's attendance at the Hartman School, rather than Troost. Finally, the address which Gardner verified as falling within Kansas City's Chapter I area does not correspond to either of Rickey Fuqua's addresses or Nicole Dalton's home address. Although the evidence may have supported a conclusion that the children were geographically eligible for Chapter I services, substantial doubt remained and it was also possible to infer that they were not. Under Fed.R.Civ.P. 52(a), our function is not to decide factual issues *de novo*, and when there are two permissible views of the evidence the factfinder's choice between them cannot be clearly erroneous. *Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). We affirm the district court's finding and its ruling that Geneva Dalton lacked standing to sue on behalf of the two children.[9]

### IV.

■ Secretary Bennett argues that the district court erred in concluding that he was not entitled to qualified immunity from Pulido, Gooden and Dalton's claim for damages. The district court determined that the amended complaint contained adequate factual allegations that Bennett had violat-

---

**9.** Dalton argues that 34 C.F.R. § 200.3(b) (1987), applied to the evidence, establishes geographic eligibility. However, the record indicates that Dalton did not raise this argument or cite the regulation before the district court, and we will not consider it for the first time on appeal. *See Stafford v. Ford Motor Co.,* 790 F.2d 702, 706 (8th Cir.1986).

ed "clearly established law" by attempting to avoid implementing and refusing to implement and follow the Supreme Court's decision in *Aguilar v. Felton. See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In support of the district court's ruling, Pulido, Gooden and Dalton argue that Secretary Bennett was "vociferously opposed" to the *Aguilar* decision and violated it by authorizing the use of mobile vans on parochial school property.

This court has recently stated that qualified immunity accommodates competing social interests by ensuring that officials who "knowingly violate the law" are held accountable, while officials who reasonably exercise their discretion may do so without fear of being sued. *Arcoren v. Peters,* 829 F.2d 671, 673 (8th Cir.1987) (en banc). When performing a discretionary function, a government official is entitled to qualified immunity from suit if, at the time of his conduct, it was not "clearly established" that his actions would violate the plaintiff's constitutional rights. *Id.* at 673, 676–77.[10] The qualified immunity defense fails when the official acts in a manner that disregards undisputed constitutional guarantees, but an official is not expected to anticipate the law's development or its possible application to a unique situation. *Id.* at 673. Thus, an official may not be charged with knowledge that his conduct was unlawful unless it has been previously identified as such, and an official does not forfeit immunity because he "gambled and lost on the resolution of [an] open question." *Id.* (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 535, 105 S.Ct. 2806, 2820, 86 L.Ed.2d 411 (1985)).

Applying these principles to the pleadings, we must reverse the district court's ruling. With respect to the claims of personal opposition, such allegations "[do] not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." *Harlow,* 457 U.S. at 817–18, 102 S.Ct. at 2737–38. With regard to the claims of delay and inaction,

the complaint contains no factual allegations that Secretary Bennett required or permitted the Missouri bypass contractor, BHHC, to provide Chapter I services in parochial schools after *Aguilar* was decided. The sole issue, then, is whether the Secretary violated "clearly established law" by authorizing the use of mobile vans on parochial school property. In *Wolman v. Walter,* 433 U.S. 229, 247–48, 97 S.Ct. 2593, 2605–06, 53 L.Ed.2d 714 (1977), the Supreme Court held that providing remedial services at "religiously neutral locations" off the premises of nonpublic schools does not violate the establishment clause. The Court anticipated that mobile units would be used for this purpose, but did not consider the circumstances under which such units would constitute "neutral sites." *Id.* at 246–47, 97 S.Ct. at 2604–05. Moreover, no subsequent cases, including *Aguilar,* have confronted the issue. Thus, in June of 1986, when the Secretary issued guidelines authorizing the use of mobile vans on the property of sectarian schools, a "legitimate question" existed regarding the constitutionality of this practice, which has yet to be resolved. *See Mitchell,* 472 U.S. at 535 n. 12, 105 S.Ct. at 2820 n. 12. This conclusion is sufficient to sustain a claim of qualified immunity, *see Arcoren,* 829 F.2d at 676, and requires us to reverse the judgment of the district court. Pulido, Gooden and Dalton's claim for damages from Secretary Bennett for his alleged failure to implement *Aguilar* should be dismissed.

V.

We affirm the orders of the district court denying standing, but the district court's order denying Secretary Bennett qualified immunity is reversed, and the case is remanded to the district court for dismissal of the remaining claim against Secretary Bennett in his individual capacity. The stay of trial proceedings entered on July 18, 1986, is vacated.

---

10. No argument is made that Secretary Bennett was not performing a discretionary function in

this case.